Scott A. Ambrose, Esq. (#012614)
**BURG SIMPSON ELDREDGE
HERSH & JARDINE PC**
2390 East Camelback Rd., Suite 403
Phoenix, Arizona 85016
Phone: (602) 777-7000
Fax: (602) 777-7008
sambrose@burgsimpson.com
azcourt@burgsimpson.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| **KIMBERLY BOYER,** | Case No. |
| **Plaintiff,** | |
| **v.** | **COMPLAINT AND JURY DEMAND** |
| **JOHNSON & JOHNSON; MEDICAL DEVICES BUSINESS SERVICES, INC. f/k/a DEPUY ORTHOPAEDICS, INC.; SYNTHES USA PRODUCTS, LLC.; DEPUY SYNTHES SALES, INC.;** | |
| **Defendants.** | |

Plaintiff Kimberly Boyer, by and through counsel, and for her complaint against Defendants Johnson & Johnson, Medical Device Business Services, Inc., f/k/a DePuy Orthopaedics, Inc., Synthes USA Products, LLC, and DePuy Synthes Sales, Inc. allege as follows:

<u>PARTIES AND JURISDICTION</u>

1. Plaintiff Kimberly Boyer is a resident and citizen of Mesa, Arizona, in Maricopa County, Arizona.

2. Plaintiff alleges an amount in controversy in excess of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

3. Johnson and Johnson is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, NJ 08933. Johnson and Johnson is a resident and citizen of New Jersey.

4. Defendant Medical Device Business Services, Inc., f/k/a DePuy Orthopaedics, Inc., is an Indiana corporation with its principal place of business at 700 Orthopaedic Drive, Warsaw, Indiana 46581. Defendant Medical Device Business Service, Inc. is a resident and citizen of Indiana. Medical Device Business Services, Inc. is an indirect subsidiary of Johnson & Johnson.

5. Defendant Synthes USA Products, LLC is a Delaware corporation with its principal place of business at 1302 Wrights Lane East, West Chester, Pennsylvania 19380. Defendant Synthes USA Products, LLC is a resident and citizen of Delaware and Pennsylvania. Synthes USA Products, LLC is a wholly-owned subsidiary of Medical Device Business Services, Inc. and an indirect subsidiary of Johnson & Johnson.

6. Defendant DePuy Synthes Sales, Inc. is a Massachusetts corporation with its principal place of business at 325 Paramount Drive, Raynham, Massachusetts 02767. Defendant DePuy Synthes Sales, Inc. is a resident and citizen of Massachusetts. DePuy Synthes Sales, Inc. is an indirect subsidiary of Johnson & Johnson.

7. Upon information and belief, at all times relevant hereto, Johnson & Johnson, Medical Device Business Services, Inc., f/k/a DePuy Orthopaedics, Inc., Synthes USA Products, LLC, and DePuy Synthes Sales, Inc. (hereinafter collectively referred to as

"Defendants") were engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, numerous orthopedic devices, including the Synthes Radial Head Prosthesis System.

8.      This court has jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9.      Venue in this district is appropriate under 28 U.S.C. §1391 because a substantial part of the events giving rise to this claim occurred in this district and Defendants conducted business in this jurisdiction and/or venue such that they are subject to the Court's personal jurisdiction.

FACTUAL BACKGROUND

Synthes Radial Head Prosthesis System

10.      Defendants' Synthes Radial Head Prosthesis System is considered a Class II medical device under 21 CFR § 860 and 21 CFR § 888.3170.

11.      Defendants received marketing approval from the Food and Drug Administration (FDA) for the Synthes Radial Head Prosthesis System under Section 510(k) of the Federal Food, Drug, and Cosmetic Act (the "Act"). *See* 21 U.S.C. § 360 et seq.

12.      The 510(k) approval process by the FDA is regarded as a simplified application process, which does not require extensive review and approval by the FDA. The 510(k) approval is basically a "grandfathering" process, in which the manufacturer is only required to demonstrate that the device to be marketed is substantially equivalent to a device

marketed prior to May 28, 1976, or substantially equivalent to a device which has already been found to be substantially equivalent through the 510(k) premarket notification process. If substantial equivalence is demonstrated, the FDA allows the product to be marketed but does not actually approve the design. The 510(k) approval process is rooted in a determination of "substantial equivalence" rather than safety and effectiveness. 21 CFR § 807.100.

13.     When clearing a medical device for marketing through the 510(k) process, the FDA makes no determination or approval of the device's safety and effectiveness. In fact, FDA regulations specifically prohibit a manufacturer from "misbranding" a 510(k)-cleared device by claiming that it has been "approved" by the FDA. 21 CFR § 807.97.

14.     On or about May 17, 2012, Defendants submitted a 510(k) premarket notification for the Synthes Radial Head Prosthesis System. According to the 510(k) submission, "The Synthes Radial Head Prosthesis is a two-piece modular system comprised of titanium alloy stem and cobalt head components with an integral screw and side-loading application to allow for in situ assembly. The system consists of a range of lengths and diameters for the stem in both straight and curved configurations as well as heads in a range of diameters and heights to accommodate the surgical need."

15.     Defendants' 510(k) submission to FDA further states an "Intended Use" for the Synthes Radial Head Prosthesis System: "1.   Replacement of the radial head for degenerative or post-traumatic disabilities presenting pain, crepitation, and decreased motion at the radio-humeral and/or proximal radio-ulner joint with: a. joint destruction and/or subluxation visible on x-ray; b. resistance to conservative treatment. 2.   Primary

replacement after fracture of the radial head. 3. Symptomatic sequelae after radial head resection. [4]. Revision following failed radial head arthroplasty."

16.     In terms of demonstrating substantial equivalence, Defendants' 510(k) submission states "[t]he proposed Synthes Radial Head Prosthesis has the same indications for use, the same fundamental technological characteristic, and similar materials as the predicate Biomet ExploR (K051385) and Ascension (K032686) Modular Radial Head Devices. In vitro performance testing demonstrates the ability of the proposed device to withstand the same clinical loads of the radiocapitellar joint." Defendants' 510(k) submission concludes that "the proposed Synthes Radial Head Prosthesis System does not raise any new issues of safety and effectiveness in comparison to the predicate devices."

17.     On or about June 19, 2012, the FDA found the Synthes Radial Head Prosthesis System to be substantially equivalent to legally marketed predicate devices and granted marketing approval. The FDA's marketing approval specifically referenced the four indications for use as stated by Defendants in its submission.

18.     Pursuant to the § 510(k) approval process, Defendants were responsible for complying with the Act's requirements, including but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); good manufacturing practice requirements as set forth in the quality systems (QS) regulation (21 CFR Part 820); and, if applicable, the electronic product radiation control provisions (Sections 531-542 of the Act).

19.     A December 3, 2013 press release from Defendants announced the launching of the Radial Head Prosthesis System in the United States. The press release stated that the new Radial Head Prosthesis System could be used for "primary and revision joint

replacement of the radial head to restore joint function." Furthermore, the "System offers several benefits over current technologies."

20.     Defendants' product information and surgical technique brochures for the Radial Head Prosthesis System set forth the intended use for the product, including "to restore joint function;" "replacement of the radial head for degenerative or post-traumatic disabilities presenting pain, crepitation and decreased motion at the radiohumeral and/or proximal radioulnar joint with joint destruction and/or subluxation visible on x-ray [and] resistance to conservative treatment;" and "primary replacement after fracture of the radial head."

21.     Defendants' product label for the Synthes Radial Head Prosthesis System also set forth the indications for the prosthesis: "1.   Replacement of the radial head for degenerative or post-traumatic disabilities presenting pain, crepitation, and decreased motion at the radio-humeral and/or proximal radio-ulnar joint with: a. Joint destruction and/or subluxation visible on x-ray; b. Resistance to conservative treatment; 2. Primary replacement after fracture of the radial head; 3. Symptomatic sequelae after radial head resection; 4. Revision following failed radial head arthroplasty."

22.     Although Defendants' product label states that "changes in position and loosening of the implant" is a possible adverse effect and complication of the Synthes Radial Head Prosthesis, the product label does not state that the risk of loosening was greater, more frequent, more expected, more likely, more probable, etc. than the risk of loosening from other substantially equivalent and/or comparable predicate devices,

- 6 -

particularly the Biomet ExploR (K051385) and Ascension (K032686) Modular Radial Head devices.

23.     On or about December 29, 2016, Defendants issued a Class 2 recall for the Synthes Radial Head Prosthesis System. According to the FDA recall notice, the reason for the recall was "[t]here is the possibility that the radial stem may loosen post-operatively at the stem bone interface."

24.     According to Defendants' December 30, 2016 letter to healthcare professionals, Defendants removed the entire Synthes Radial Head Prosthesis System from the market due to post-operative loosening of the radial stem at the stem bone interface. Defendants' notice further states, "[b]ased on the currently available data, we believe the cause to be multifactorial (including possible product characteristics, operative and patient factors), but we have not been able to fully characterize these factors. Consequently, we have not been able at this time to issue further instructions to surgeons that might lead to a reduction in issue rate and have decided to remove the DePuy Synthes Radial Head Prosthesis Stem from the global market."

25.     Defendants' December 30, 2016 letter to healthcare professionals further explains that "[i]f the radial stem becomes loose post-operatively, the following may occur: Device Loosening, Osteolysis, Poor Joint Mechanics, Pain, Bone Fracture – Post-operatively, and Soft tissue Damage (Soft Tissue Irritation)."

26.     According to a September 2017 article published in the Journal of Orthopaedic Trauma, "Radial Neck Dilatory Remodeling After Radial Head Arthroplasty with an Uncemented, Press Fit, Fully Chemically Etched Stem Design," radial neck dilatory

remodeling as well as periprosthetic radiographic lucency (i.e., device loosening) were seen significantly more frequently and to a significantly greater degree in the Synthes Radial Head Prosthesis System when compared to the Biomet ExploR Radial Head. The comparative Biomet ExploR Radial Head in this study is the same device Defendants relied on to prove substantial equivalence in order to get marketing approval for the Synthes Radial Head Prosthesis System.

27. Despite Defendants' representations in its 510(k) submission to FDA that the Synthes Radial Head Prosthesis System was substantially equivalent to the Biomet ExploR Radial Head, a retrospective cohort study reveals the devices were not substantially equivalent, as radial neck dilatory remodeling as well as periprosthetic radiographic lucency (i.e., device loosening) were seen significantly more frequently and to a significantly greater degree in the Synthes Radial Head Prosthesis System when compared to the Biomet ExploR Radial Head.

28. According to the Total Product Life Cycle report issued by FDA (accessed December 27, 2018), there have been 504 reports filed with the FDA Manufacturer and User Facility Device Experience (MAUDE) database for the Synthes Radial Head Prosthesis. Of those 504 reports, 162 reports involve "unintended movement," 43 reports involve "migration or expulsion of device," and 19 reports involve "loose or intermittent connection."

Plaintiff Kimberly Boyer

29. On or about March 3, 2016 Plaintiff Kimberly Boyer, at the age of 45, was involved in a motor vehicle collision as a passenger, injuring her right elbow, including a

three-part fracture of her right radial head. Plaintiff Boyer's medical records indicate she suffered a comminuted right radial head fracture with displaced fragments.

30.     On or about March 10, 2016, Plaintiff Kimberly Boyer underwent surgery to repair the fracture of her right radial head. Specifically, Plaintiff underwent an open reduction internal fixation and radial head arthroplasty.  During the surgery, Dr. Andrew Wellman repaired Plaintiff's radial head fracture by replacing it with a Synthes Radial Head Prosthesis; radial stem part no. 04.402.008, lot #7855596 and radial head part no. 09.402.022, lot #9879601.  (See Exhibit A.)

31.     The Radial Head Prosthesis System used in Plaintiff Boyer's original surgery was designed, manufactured, marketed, supplied, and sold by Defendants.

32.     Following the surgery, Plaintiff Boyer continued to follow up with her physicians, as well as followed up with the physical therapy activities and exercises she was prescribed.

33.     While Plaintiff Boyer initially did fine with her radial head replacement, in approximately late 2016, Plaintiff Boyer began suffering from pain in her right arm and was concerned because her elbow was not recovering as well as her physician had originally predicted.

34.     Throughout 2017 and early 2018, Plaintiff Boyer continued to have pain, as well as function and mobility issues with her right arm and elbow.  A bone scan in June 2018 failed to reveal any problems with the radial head prosthesis.

35.     In March 2019, Plaintiff Boyer's right elbow locked up and she sought treatment in the emergency room.  Plaintiff Boyer then followed up with a few orthopedic physicians regarding the problems she was having with her right elbow.

36.     In April 2019, Plaintiff Boyer saw Dr. Michael Montague complaining of continued pain in her right elbow and forearm area where the radial head prosthesis was located.  Imaging showed signs of loosening of the radial head and Dr. Montague recommended surgery to remove the radial head prosthesis.

37.     On April 18, 2019, Plaintiff Boyer underwent surgery to remove the radial head prosthesis.  Dr. Montague's operative report states:  "Once I identified the radial head arthroplasty, it was noted to be very loose within the radial shaft.  I loosen [sic] the set screw and removed the implant in 2 parts and found it to be a Synthes radial head arthroplasty with no appreciable bone on growth to the stem."

38.     During the April 18, 2019 surgery, Dr. Montague chose not to install a replacement radial head prosthesis.  Plaintiff Boyer has been informed by her treating physician that it is likely she will have to undergo another surgery in the future to install another radial head prosthesis.

39.     Thus, as a direct and proximate result of Defendants' failed and defective Radial Head Prosthesis System, Plaintiff Boyer was required to undergo surgery to remove the Radial Head Prosthesis three years after the radial head prosthesis was originally implanted.

40.     As a direct and proximate result of Defendants' failed and defective Radial Head Prosthesis System, Plaintiff Boyer has suffered significant harm, conscious pain and suffering, physical injury and bodily impairment.

41.     As a direct and proximate result of Defendants' failed and defective Radial Head Prosthesis System, Plaintiff Boyer had to undergo a premature revision surgery of her prosthetic radial head, causing further permanent impairment and weakness in her ligaments, bone and muscles and potentially more surgeries in the future.

42.     As a direct and proximate result of Defendants' failed and defective Radial Head Prosthesis System, Plaintiff Boyer has suffered significant mental anguish and emotional distress and will continue to suffer physical limitations, pain, injury, damages, harm, and mental and emotional distress in the future.

43.     As a direct and proximate result of Defendants' failed and defective Radial Head Prosthesis System, Plaintiff Boyer has also incurred medical expenses and other economic harm, and will continue to incur such expenses and other economic harm in the future.

## FIRST CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY

44.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

45.     Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of orthopedic devices including the Synthes Radial Head Prosthesis System. As stated in the 510(k) submission to the FDA, the product and surgical brochures, and the

product label, the "Radial Head Prosthesis System is indicated for the replacement of the radial head for degenerative or post-traumatic disabilities presenting pain, crepitation, and decreased motion at the radiohumeral and/or proximal radioulnar joint with joint destruction and/or subluxation visible on x-ray and/or resistance to conservative treatment." The Radial Head Prosthesis System is also indicated for "primary replacement after fracture of the radial head."

46.     The Synthes Radial Head Prosthesis System, manufactured and supplied by Defendants, was defective in design or formulation in that, when it left the hands of the Defendants, the foreseeable risks of the product exceeded the benefits associated with its design. The Synthes Radial Head Prosthesis System was defective in design such that the nature and magnitude of the risks of harm associated with the design of the Radial Head Prosthesis System exceeded the benefits of the device with the intended and reasonable foreseeable uses.

47.     The Synthes Radial Head Prosthesis System was defective in design in that, while based upon a claim of substantial equivalence to the predicate devices – i.e., the Biomet ExploR Radial Head Prosthesis System (K051385) or the Ascension Modular Radial Head (K032686) – in fact, the Synthes Radial Head Prosthesis System was more dangerous and imposed greater risks of harm than both the predicate devices. A retrospective cohort study reveals the design modifications of the Synthes Radial Head Prosthesis from the predicate devices caused radial neck dilatory remodeling as well as periprosthetic radiographic lucency (i.e., device loosening) significantly more frequently

and to a significantly greater degree in the Synthes Radial Head Prosthesis System when compared to the Biomet ExploR Radial Head.

48.     The Synthes Radial Head Prosthesis System was defective in that at the time the product left the control of Defendants, a practical and technically feasible safer design was available that would have prevented the harm for which Plaintiff Boyer seeks to recover without substantially impairing the usefulness or intended purpose of the product.

49.     In fact, at the time Defendants submitted the 510(k) premarket notification, practical, feasible and reasonable alternative designs already existed – i.e., the Biomet ExploR Radial Head Prosthesis System (K051385) and the Ascension Modular Radial Head (K032686).   According to the FDA database, both the Biomet ExploR Radial Head Prosthesis System and Ascension Modular Radial Head are still approved for marketing and have not been subject to any product recalls.

50.     The Synthes Radial Head Prosthesis System was defective in design such that the failure of Radial Head Prosthesis System was more dangerous than an ordinary consumer, such as Plaintiff Boyer, would expect when used in an intended or reasonably foreseeable manner.

51.     In December 2016, Defendants recalled and removed the device from the market due to its defective design.  As noted in Defendants' notice of recall and removal of the Radial Head Prosthesis System from the market, the radial stem was loosening post-operatively at the stem bone interface resulting in device loosening, osteolysis, poor joint mechanics, pain, bone fracture post-operatively, and soft tissue damage.

52.     Plaintiffs Boyer's Radial Head Prosthesis System device was subject to the recall. Plaintiff Boyer's Radial Head Prosthesis System failed consistent with the recall – i.e., loosening at the stem bone interface resulting in device loosening, osteolysis, poor joint mechanics, pain and soft tissue damage.

53.     The Synthes Radial Head Prosthesis System, manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants, was defective due to inadequate warning or instruction because at the time it left the control of Defendants, Defendants knew or should have known that the Synthes Radial Head Prosthesis System was unreasonably dangerous due to a high risk of loosening and failure associated with the radial head and stem.

54.     Although the product label for the Synthes Radial Head Prosthesis System does state "changes in position and loosening of the implant" is a possible adverse effect and complication of the Synthes Radial Head Prosthesis, the product label does not state that the risk of loosening was greater, more frequent, more expected, more likely, more probable, etc. than the risk of loosening from other comparable predicate devices, particularly the Biomet ExploR (K051385) and Ascension (K032686) Modular Radial Head devices.

55.     Despite the fact that Defendants knew or should have known that the Synthes Radial Head Prosthesis System was unreasonably dangerous due to a high risk of loosening and failure associated with the radial head and stem, particularly when compared to the alternative available designs, Defendants failed to exercise reasonable care to adequately warn consumers that the Synthes Radial Head Prosthesis System had an increased risk of

injury and harm necessarily resulting in a risk of required revision surgery to remove and/or replace the radial head prosthesis.

56.     As a direct and proximate result of Plaintiff Boyer's use of the Synthes Radial Head Prosthesis System, as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce by Defendants, Plaintiff suffered serious physical injuries, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

57.     The actions and omissions as alleged in this complaint demonstrate Defendants consciously pursued a course of conduct knowing it created a substantial risk of significant harm to others and/or acted with an evil mind so as to warrant the imposition of punitive damages.

## SECOND CAUSE OF ACTION

### NEGLIGENCE

58.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

59.     Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of orthopedic devices including the Synthes Radial Head Prosthesis System.  As stated in the 510(k) submission to the FDA, the product and surgical brochures and the product label, the "Radial Head Prosthesis System is indicated for the replacement of the radial head for degenerative or post-traumatic disabilities presenting pain, crepitation, and decreased motion at the radiohumeral and/or proximal radioulnar joint with joint destruction and/or subluxation visible on x-ray and/or resistance to conservative treatment." The Radial

Head Prosthesis System is also indicated for "primary replacement after fracture of the radial head."

60.     Defendants had a duty to design, distribute, sell and/or supply orthopedic devices, including the Synthes Radial Head, in a manner which would be considered safe and not misbranded.

61.     A medical device is considered misbranded if it is dangerous to health when used in a manner recommended by the manufacturer, distributor and/or seller. Defendants' Radial Head Prosthesis was misbranded as it is dangerous to health due to the high risk of loosening and failure.

62.     A medical device is considered misbranded if the labeling and/or instructions for use are false or misleading in any manner. Defendants' Radial Head Prosthesis was misbranded as the labeling and/or instructions for use failed to disclose there was a high risk of loosening and failure with the device.

63.     Defendants breached its duty to design, distribute, sell and/or supply its Synthes Radial Head Prosthesis in a manner which was safe and not considered misbranded as it was reasonably foreseeable that users such as Plaintiff Boyer would suffer injury from a defectively designed medical device.

64.     Defendants breached its duty to design, distribute, sell and/or supply its Synthes Radial Head Prosthesis in a manner which was safe and not considered misbranded as Defendants failed to disclose in the label and/or instructions for use that there was a high risk of loosening and failure with the device.

65.     As a direct and proximate result of Defendants' defectively designed Radial Head Prosthesis and failure to disclose there was a high risk of loosening and failure with the device, Plaintiff suffered serious physical injuries, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

66.     The actions and omissions as alleged in this complaint demonstrate Defendants consciously pursued a course of conduct knowing it created a substantial risk of significant harm to others and/or acted with an evil mind so as to warrant the imposition of punitive damages.

### THIRD CAUSE OF ACTION

### BREACH OF EXPRESS WARRANTY

67.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

68.     Defendants are the manufacturers, designers, distributors, sellers, and/or suppliers of orthopedic devices including the Synthes Radial Head Prosthesis System. As stated in the 510(k) submission to the FDA, the product and surgical brochures, and the product label, the "Radial Head Prosthesis System is indicated for the replacement of the radial head for degenerative or post-traumatic disabilities presenting pain, crepitation, and decreased motion at the radiohumeral and/or proximal radioulnar joint with joint destruction and/or subluxation visible on x-ray and/or resistance to conservative treatment." The Radial Head Prosthesis System is also indicated for "primary replacement after fracture of the radial head."

69.     The Synthes Radial Head Prosthesis System, manufactured and supplied by Defendants was defective in that, when it left the hands of Defendants, it did not conform to representations made by Defendants concerning the product; i.e., that the Radial Head Prosthesis offered several benefits over current technologies; that the radial head and stem could be used to restore joint function in patients; that the radial stem had a fluted design for rotational stability; that the curved stem was designed to fit the physiological bend of the proximal radius in patients; that the surface of the radial stem helped promote bony on-growth and stability; that the radial head and stem could be used for the replacement of the radial head for degenerative or post-traumatic disabilities in patients presenting pain, crepitation, and decreased motion at the radiohumeral and/or proximal radioulnar joint with joint destruction and/or subluxation visible on x-ray in patients resistant to conservative treatment; and, that the radial head and stem could be used in primary replacement after fracture of the radial head.

70.     Plaintiff Boyer and/or her physician, at the time they selected the Synthes Radial Head Prosthesis System to be used in Plaintiff's surgery, justifiably relied upon Defendants' representations that the Synthes Radial Head Prosthesis System was safe for use in radial head replacement surgery and would conform to the representations regarding the character and quality of an appropriate prosthesis to be used in radial head replacement surgery.

71.     In fact, the Synthes Radial Head Prosthesis System did not offer benefits over current technologies, did not restore joint function in Plaintiff Boyer, did not provide stability in the radial head of Plaintiff Boyer, and was not effective in the treatment of

Plaintiff Boyer's radial head fracture. Clearly, the Synthes Radial Head Prosthesis System did not offer benefits over the available alternative design of the Biomet ExploR Radial Head Prosthesis System (K051385), as a retrospective cohort study reveals radial neck dilatory remodeling as well as periprosthetic radiographic lucency (i.e., device loosening) were seen significantly more frequently and to a significantly greater degree in the Synthes Radial Head Prosthesis System when compared to the Biomet ExploR Radial Head.

72.     As a direct and proximate result of Plaintiff Boyer's use of the Synthes Radial Head Prosthesis System and Plaintiff's and/or Plaintiff's physician's reliance on Defendants' representations regarding the character and quality of the Synthes Radial Head Prosthesis System, Plaintiff suffered serious physical injuries, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

73.     The actions and omissions as alleged in this complaint demonstrate Defendants consciously pursued a course of conduct knowing it created a substantial risk of significant harm to others and/or acted with an evil mind so as to warrant the imposition of punitive damages.

**FOURTH CAUSE OF ACTION**

**FRAUDULENT / NEGLIGENT MISREPRESENTATION**

74.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

75.     Defendants, as the designers, manufacturers, suppliers and sellers of the Synthes Radial Head Prosthesis System being used by physicians and patients in orthopedic surgery, have a general duty not to deceive or misrepresent the safety, quality,

characteristics, etc., of the Synthes Radial Head Prosthesis System they design, manufacture, distribute, sell, and supply.

76. In the exercise of reasonable care, Defendants should have known that the Synthes Radial Head Prosthesis System was not safe for its intended use and failed to meet design requirements and/or was in other ways out of specification or deviated from performance standards. Yet, Defendants, in breach of their general duty not to deceive, negligently misrepresented to Plaintiff and/or Plaintiff's physician that the Synthes Radial Head Prosthesis System was safe for its intended use and/or met all applicable design requirements.

77. Defendants negligently and/or fraudulently concealed from Plaintiff and/or Plaintiff's physician that the Synthes Radial Head Prosthesis System lacked the proper design, safety, quality, and characteristics to be used for its intended use; i.e., for the replacement of the radial head for degenerative or post-traumatic disabilities presenting pain, crepitation, and decreased motion at the radiohumeral and/or proximal radioulnar joint with joint destruction and/or subluxation visible on x-ray and/or resistance to conservative treatment; for the primary replacement after fracture of the radial head.

78. Defendants negligently and/or fraudulently concealed from Plaintiff and/or Plaintiff's physician that the Synthes Radial Head Prosthesis System had an unreasonable and unexpected possibility of loosening post-operatively at the stem bone interface resulting in device loosening, osteolysis, poor joint mechanics, pain, bone fracture post-operatively and soft tissue damage.

79. Defendants negligently and/or fraudulently represented to Plaintiff and/or Plaintiff's physician that the Synthes Radial Head Prosthesis System was based upon a claim of substantial equivalence to predicate devices (the Biomet ExploR Radial Head Prothesis System (K051385) and the Ascension (K032686) Modular Radial Head), yet offered several benefits over current technologies. However, such representations were false. The Synthes Radial Head Prosthesis System was not based on a claim of substantial equivalence to the predicate devices and did not offer several benefits over the current technologies, as is evident by the retrospective cohort study demonstrating that radial neck dilatory remodeling as well as periprosthetic radiographic lucency (i.e., device loosening) were seen significantly more frequently and to a significantly greater degree in the Synthes Radial Head Prosthesis System when compared to the Biomet ExploR Radial Head.

80. Defendants' representations about the safety, quality, and characteristics of its Synthes Radial Head Prosthesis System were made with utter disregard and recklessness as to the truth of such representations.

81. Plaintiff and Plaintiff's physician reasonably relied to their detriment upon Defendants' misrepresentations that the Synthes Radial Head Prosthesis System was safe for use and would perform to its intended purposes and standards.

82. As a direct and proximate result of Defendants' breach of its duty and negligent misrepresentations and/or fraudulent concealments about the Synthes Radial Head Prosthesis System, Plaintiff's physicians chose to use Defendants' Synthes Radial Head Prosthesis System in Plaintiff Boyer's original surgery.

83.     As a direct and proximate result of the failure of Defendants' Synthes Radial Head Prosthesis System, Plaintiff Boyer has suffered serious physical injuries, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

84.     The actions and omissions as alleged in this complaint demonstrate Defendants consciously pursued a course of conduct knowing it created a substantial risk of significant harm to others and/or acted with an evil mind so as to warrant the imposition of punitive damages.

WHEREFORE, Plaintiff prays for relief as follows:

1)      Compensatory and punitive damages in excess of the jurisdictional amount;

2)      Economic damages in the form of medical expenses, loss of income, out of pocket expenses, and other economic damages in an amount to be determined at trial of this action;

3)      Attorneys' fees, expenses, and costs of the action; and

4)      Such further relief as the Court deems necessary, just, and proper.

Respectfully submitted,

*/s/Scott A. Ambrose*
Scott A. Ambrose
BURG SIMPSON ELDREDGE HERSH & JARDINE, PC
2390 East Camelback Rd., Suite 403
Phoenix, Arizona 85016
*Attorneys for Plaintiff Kimberly Boyer*

***Of Counsel:***
Melanie S. Bailey
BURG SIMPSON ELDREDGE HERSH & JARDINE, PC
312 Walnut Street, Suite 2090
Cincinnati, OH 45202
(513) 852-5600
(513) 852-5611 (fax)

JURY DEMAND

Plaintiff hereby demands a trial by jury.

*/s/ Scott A. Ambrose*
Scott A. Ambrose